No. 30,088.

FRED HOFFMAN, as the HOFFMAN PRODUCE COMPANY, *Appellee*, v. RALPH HURST and HURST MAJORS, as HURST & MAJORS, *Appellants*.

(8 P. 2d 837.)

Opinion filed March 5, 1932.

*H. E. Harlan, A. M. Johnston* and *Walter Reed Gage*, all of Manhattan, for the appellants.

*Joe E. Lynch*, of Herington, *R. P. Evans* and *George Clammer*, both of Manhattan, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover the price of eggs and poultry sold and delivered by plaintiff to defendants. Plaintiff recovered, and defendants appeal.

Defendants are wholesale dealers in eggs and poultry at Manhattan. They had a field agent, Ninneman, who lived at Herington, and who purchased eggs and poultry for defendants and delivered the produce to defendants at Manhattan. Plaintiff, who did business at Hope, purchased eggs and poultry from farmers and others, and sold the produce to Ninneman, during a period extending from June to August, 1929. Ninneman was authorized to pay for produce by giving, at the time of purchase, a draft drawn on defendants in favor of the seller. About the end of July, 1929, defendants noted that Ninneman was short in delivery of produce, and defendants protested a number of drafts which he had drawn. Among them were six drafts given to plaintiff. Plaintiff sued for the amounts of the drafts. Plaintiff also sued for the sum of $982.48, claimed to be due for sales made on August 7 and August 8, for which no drafts were given.

Defendants denied liability, and filed a counterclaim. The counterclaim was based on these charges: Each morning defendants fixed the price, based on market price, at which Ninneman might buy produce, allowing a small margin to meet competition; in collusion with plaintiff, Ninneman purchased from plaintiff at prices far above the market and far above the prices authorized by defendants; by means of this fraudulent practice, which continued throughout the summer of 1929, plaintiff obtained a large amount of defendants' money. Defendants also counterclaimed for certain shortages, and for bad eggs.

The case was tried by a referee, who made findings of fact. The referee allowed the counterclaim for shortages and bad eggs, denied the counterclaim based on fraud, and allowed plaintiff's claim for the amounts of the protested drafts, and for the item of $982.48. The referee's report was approved by the district court, and judgment was entered accordingly.

So far as denial of the counterclaim based on fraud is concerned, the court is constrained to say the findings of the referee that plaintiff was not in collusion with the agent, and did not know of the restriction on authority to fix prices, are sufficiently sustained by

evidence. The allowances by the referee for the drafts and for the sales made on August 7 and 8, 1929, are contested on the ground the law was misapplied, and will be discussed.

Ninneman was provided with draft books containing drafts with which to pay for eggs and poultry. The drafts bore serial numbers. When produce was purchased, a draft for the amount of the purchase, signed by Ninneman, and payable to the seller, was drawn on defendants, through a bank in Manhattan, and was given to the seller. The stub of each draft bore the number of the draft, and when properly filled out was a record of the transaction—date, to whom issued, quantity of eggs or poultry purchased, and price paid. The stubs were delivered to defendants, usually but not always, at the time the produce was delivered.

Plaintiff commenced selling eggs to Ninneman about June 1, 1929. For a short time after June 1 plaintiff sold some produce to others. He then sold exclusively, or practically so, to Ninneman, because Ninneman paid a higher price than other buyers. When plaintiff commenced to deal with Ninneman, Ninneman told plaintiff he was purchasing for defendants, said he had a draft book, and said he would use the draft book when he got eggs and poultry. When plaintiff sold to Ninneman, they would go to plaintiff's office and compute the amount. Ninneman would give plaintiff a draft, and fill out the draft stub. Plaintiff would turn to his book and mark the amount as paid. Ninneman would fill out the stub to show the correct amount of money, and to show the authorized price, but because he was paying a higher price, he would make the stub show a larger quantity of eggs and poultry than he actually received. Ninneman was paid a commission of twenty-five cents per case of eggs, and one cent per pound of poultry, and his compensation was increased by the apparently larger number of cases of eggs and pounds of poultry.

To facilitate conduct of his business, Ninneman had. a concentration point in Herington where he stored eggs and poultry. The latter part of July Ninneman's attention was called to the fact that he was short in delivery of produce. He explained he had produce at his concentration point, and said he would bring it in. Very large discrepancies between deliveries and draft stubs were discovered, and were not made good. About August 1 Ninneman was told not to buy any more until his account was cleared, and was told to stop writing drafts.

On July 30 Ninneman gave plaintiff a draft for $941.75 which was not paid, and which was protested on August 3. On July 31 Ninneman gave plaintiff a draft for $788 which was not paid, and which was protested on August 3. On August 5, having received notice of protest, plaintiff called defendants by telephone, and had a conversation with Majors. There is a dispute about what was said. The referee found Majors told plaintiff the drafts would not be paid until Ninneman cleared his account, meaning Ninneman must bring in eggs and poultry to balance purchases shown by draft stubs, and implying the drafts would be paid if deliveries were made. Plaintiff had talked to Ninneman about protest of the drafts. The referee found Ninneman assured plaintiff he had cleared his account, and told plaintiff to send back the drafts and they would be paid. The referee did not find Majors told plaintiff to send back the drafts and they would be paid. The drafts were sent back, were not paid, and were again protested on August 8.

A draft dated August 1 for $742.60 was protested on August 6, and a draft dated August 3 for $898.88 was protested on August 6. A draft dated August 5 for $980 was protested on August 8, and a draft dated August 6 for $925.66 was protested on August 12.

Judgment for the amount of the six drafts is sustained by the following considerations: Revocation of the agent's authority to purchase and give drafts was not communicated to plaintiff. In the telephone conversation of August 5 plaintiff was not told he should not sell to the agent and take drafts. He was told defendants would not pay the protested drafts until the agent balanced his account. The agent's assurance to plaintiff that he had balanced his account did not bind defendants. Plaintiff should have obtained assurance from defendants. But payment of drafts was merely held up. Under these circumstances defendants continued to receive produce for which the drafts were drawn. The draft stubs did not accompany the deliveries, but the stubs finally came in, all the produce the agent had came in, the full amount of his shortage was ascertained, and the reason for the shortage was learned. Defendants then had in their possession, or had then sold for their own account, a large quantity of produce which plaintiff in fact delivered to the agent on drafts for the correct amount. Giving full force to the warning that drafts would not be paid except on condition, and admitting the condition was not performed, the drafts in favor of plaintiff were

themselves definite information to defendants of sales for the amount of the drafts, and defendants could not appropriate the produce to their own use without paying for it.

A banker at Hope was a witness for plaintiff, and testified as follows:

"In the summer of 1929, Hoffman was a customer of our bank, and the drafts in suit were presented to our bank by Mr. Hoffman, and when they were protested we received notice by mail and also by telegram; the first telegraph notice was received at the office at Hope at 2:45 p.m., August 5, 1929; a telegram was received at the Hope [telegraph] office on August 6, 1929, at 4:30, advising the protest of two drafts. Our bank closed at 4 o'clock. To the best of my knowledge we didn't receive notice at the bank of this protest until the following morning. We notified Hoffman immediately."

Plaintiff admitted that on August 7 he had been notified that Ninneman drafts for more than $3,200 (the amount was $3,371.23) had been turned down. With this knowledge, and with the information given by Majors in the telephone conversation of August 5, plaintiff entered into two irregular transactions with Ninneman on August 7 and 8, involving the item of $982.48 which has been referred to.

On August 7 plaintiff sold to Ninneman poultry to the amount of $229.52. Plaintiff received no draft, and testified he gave Ninneman a charge slip. Plaintiff testified Ninneman said he had left his draft book at Lost Springs. On August 8 plaintiff sold to Ninneman eggs and poultry to the amount of $752.96. Plaintiff received no draft, and testified he gave Ninneman another charge slip. Plaintiff testified Ninneman said he had forgotten his draft book. The referee made the following finding:

"The referee finds that the agent, Ninneman, was authorized to pay for the eggs and poultry at the time of the purchase, in a manner that was practically [equivalent] to the payment of cash, the method being as follows: Ninneman was supplied with a certain book, called a draft book, these books contained a considerable number of blank drafts, each having a stub for record entries. Upon the purchase by the said Ninneman of any quantity of eggs or poultry, a draft for the sum required to pay for the purchase would be drawn by Ninneman and delivered to the customer, who in turn would cash the same at his bank, and in due time the draft would be cleared by presentation at the Union National Bank of Manhattan, Kan."

As narrated above, when plaintiff commenced to deal with Ninneman, Ninneman told plaintiff Ninneman had a draft book and would use it in the purchase of produce. Plaintiff testified as follows:

"The last two exhibits are charge slips for poultry and eggs that Fred Ninneman picked up at my place on the 7th and 8th of August, and for which no drafts were issued. These are the only two tickets which I ever gave Ninneman, as he always gave me drafts for the other stuff. Late in the evening of the 7th I gave him the first ticket because he didn't have his draft book. I expected to get a draft from Ninneman whenever I delivered stuff to him. I delivered more stuff to him on the 8th, and he did not have his draft book that day, but told me he would send it to me. These are the only times I had ever done this before. He didn't have any excuse the second day except that he had forgotten it. I never got a draft for this merchandise sold on August 7th and 8th."

The fact was, the agent's authority to purchase produce had been revoked; but if revocation had not occurred, possession and use of the draft book constituted the warrant of the agent's authority to make purchases. Defendants were not bound by the false reasons Ninneman gave plaintiff for not paying by draft, and the goods sold on August 7 and 8 were sold on Ninneman's credit.

No drafts went in to defendants informing them of these purchases. No draft stubs went in to defendants whereby they might verify the purchases. Ninneman denied receiving any charge slips. Disregarding his testimony, there was no evidence that charge slips went in to defendants. Majors testified at the trial he had never seen the slips offered in evidence, and the first he heard of the transactions was when the petition was filed, or shortly before it was filed. This evidence was not contradicted, and in any event the burden rested on plaintiff to prove facts establishing liability. There was no evidence that when the produce went in there was anything to identify it as coming from plaintiff. Ninneman was short several thousand pounds of poultry and several hundred cases of eggs. He had been ordered to bring in all the produce he had, and so far as the evidence discloses there was nothing to advise defendants he was not making delivery to reduce his shortage.

Ninneman did not receive the produce as agent for defendants, because he acted outside the scope of his authority, as plaintiff was fully aware. Defendants did not receive and appropriate the produce with knowledge of the facts, and knowledge of the facts was essential to ratification by receiving the benefit of the unauthorized transaction.

"But here, as in other cases, it is indispensable that the principal should have had full knowledge of the material facts, or that he should have intentionally accepted the benefits without further inquiry than he chose to make.

Otherwise, the receipt and retention of the benefits of the unauthorized act, is no ratification of it." (1 Mechem on Agency, 2d ed., § 438.)

The first of a number of cases cited in support of this text is the case of *Bohart v. Oberne*, 36 Kan. 284, 13 Pac. 388. The case is identical in principle with this one, and it is quite similar in essential facts.

In the Bohart-Oberne case, Eldridge, agent of Oberne to buy hides, loaned money of the principal, without authority, to Withro, who sold hides to Eldridge. Withro could not pay, and turned over property to Eldridge. Eldridge, acting in the name of Oberne, sold the property to Bohart. Proceeds of the sale were paid to Oberne, and Eldridge made good the remainder of the unauthorized advancement to Withro. Included in the sale to Bohart were worthless accounts which Eldridge, acting in the name of Oberne, guaranteed. Bohart sued Oberne. The case was tried by a referee, who held Bohart was bound to know the agent acted without authority, and held Oberne was not obliged to account for benefits received. The district court rendered judgment in accordance with the conclusions of the referee, and this court affirmed the judgment. In the opinion it was said:

"It will thus be seen that the fruits of the transaction were received and retained by the defendants without any knowledge of what the transaction was. They were not received as the fruits of a contract made for them or in their behalf, but upon an independent liability existing between themselves and their agents. If the defendants had known of the material facts in the case, and that Eldridge and Hosick had acted for them and in their names, and then, with this knowledge, had retained and enjoyed the benefits of the transaction, they would be bound as fully as if they had given their agents authority in the first instance. The money which was placed to their credit was innocently held by them. The defendants could not disavow the acts of Eldridge, nor repudiate the transaction because they did not know that it had been made on their account until after the commencement of the present action. The receipt and retention of the fruits of the contract, under these circumstances, do not amount to a ratification of such contract, nor render the defendants liable in this action." (*Bohart, Dillingham & Co. v. Oberne, Hosick & Co.*, 36 Kan. 284, 291, 13 Pac. 388.)

In this instance the agent acted without authority, as plaintiff well knew. The fruits of the transactions of August 7 and 8 were received and were retained by defendants without knowledge of what the transactions were. Ninneman was under an independent liability to defendants, which he was called on to discharge by delivery of produce. The produce was not received with information

that it came from plaintiff, and was innocently received. Defendants could not ratify or disavow Ninneman's act, because defendants knew nothing about it.

As the context plainly shows, the statement in the opinion in the Bohart-Oberne case that the money received by the principal from the agent was not received as the fruit of a contract made for the principal and on his behalf, but on an independent liability of the agent, refers to the knowledge of the principal. The principal was in fact informed, and understood the agent was not turning in the fruit of a contract, but was discharging his own liability. In this instance the principal did not have even that much information.

The plaintiff having placed it in Ninneman's power to dispose of plaintiff's property so plaintiff would not get credit for it, plaintiff must look to Ninneman for reimbursement.

The judgment of the district court is modified by deducting the sum of $982.48 from the amount of the judgment. As modified, the judgment is affirmed.

JOHNSTON, C. J., not sitting.